ELECTRONIC CITATION: 2007 FED App. 0008P (6th Cir.)
File Name: 07b0008p.06

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | |
|---|---|
| In re: CHERYL A. FORBES, | ) |
| Debtor. | ) |
| _____ | ) |
| JAMES D. LYON, TRUSTEE, | ) |
| Plaintiff-Appellee, | )  No. 06-8075 |
| v. | ) |
| D. LAVONNE EISEMAN and GREGORY C. FORBES, | ) |
| Defendants-Appellant. | ) |
| _____ | ) |

Appeal from the United States Bankruptcy Court
for the Eastern District of Kentucky, at Lexington.
No. 05-54580; Adversary Case No. 06-05135.

Argued: May 1, 2007

Decided and Filed: July 25, 2007

Before: AUG, GREGG, and PARSONS, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ARGUED:** Michael J. Gartland, WISE DELCOTTO PLLC, Lexington, Kentucky, for Appellant. Chrisandrea Turner Ingram, Lexington, Kentucky, for Appellee. **ON BRIEF:** Michael J. Gartland, WISE DELCOTTO PLLC, Lexington, Kentucky, for Appellant. Chrisandrea Turner Ingram, John O. Morgan, Jr., Lexington, Kentucky, for Appellee.

---

# OPINION

---

J. VINCENT AUG, JR., Bankruptcy Appellate Panel Chief Judge. This appeal involves an alleged fraudulent transfer by Cheryl Forbes (the "Debtor") to her sister, D. Lavonne Eiseman ("Eiseman"). The disputed transfer occurred when the Debtor's ex-husband, Gregory Forbes ("Greg Forbes"), loaned approximately $157,000 to Eiseman. Eiseman used those funds as a down payment toward the purchase of a house for the Debtor in Lodi, California and subsequently, in Versailles, Kentucky. The bankruptcy court found that the $157,000 down payment on the Lodi property was, in actuality, property of the Debtor, that the transfer of the funds to Eiseman constituted an avoidable fraudulent conveyance under § 544(b) of the Bankruptcy Code, and that the Versailles property was property of the Debtor's estate.[1] For the reasons that follow, the bankruptcy court's judgment is AFFIRMED.

## I.  ISSUES ON APPEAL

The issues on appeal are: (1) whether a loan in the amount of $157,480.99 ("the $157,000 loan") from Greg Forbes to Eiseman was, in effect, a transfer of the Debtor's property; and (2) whether the Trustee has standing under § 544(b) and California law to pursue the asserted fraudulent conveyance claim against the Debtor.

## II.  JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Eastern District of Kentucky has authorized appeals to this Panel and a final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). For purposes of appeal, an order is final if it "ends the litigation on the merits and

---

[1] The Debtor's bankruptcy case was filed on October 10, 2005. Because the case was filed before the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), generally effective October 17, 2005, all references to the Bankruptcy Code in this opinion are to the pre-BAPCPA version. The Bankruptcy Code is contained in 11 U.S.C. §§ 101-1330. Unless stated to the contrary, all future statutory references are to the Bankruptcy Code, e.g., "§ ____."

leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations and internal quotation marks omitted). The bankruptcy court's judgment resolved the underlying adversary proceeding on its merits and is a final, appealable order. *See In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1392 (7th Cir. 1996) (order setting aside fraudulent conveyance under 11 U.S.C. § 548(a) is a final order); *see generally Geberegeorgis v. Gammarino (In re Geberegeorgis)*, 310 B.R. 61, 63 (B.A.P. 6th Cir. 2004) ("[A]n order that concludes a particular adversarial matter within the larger case should be deemed final and reviewable in a bankruptcy setting.") (citations omitted).

The bankruptcy court's legal conclusion that the transfer at issue constituted an avoidable fraudulent conveyance is reviewed de novo. *See Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 849 (6th Cir. 2002) (citations omitted). "Questions of standing . . . are [also] reviewed de novo." *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27, 29 (B.A.P. 6th Cir. 1998). "De novo means that the appellate court determines the law independently of the trial court's determination." *Treinish v. Norwest Bank Minn., N.A. (In re Periandri)*, 266 B.R. 651, 653 (B.A.P. 6th Cir. 2001) (citation omitted).

The bankruptcy court's determination that the challenged transfer involved property of the Debtor is a factual finding that must be upheld on appeal unless it is clearly erroneous. *Westgate Vacation Villas, Ltd. v. Tabas (In re Int'l Pharmacy & Discount II, Inc.)*, 443 F.3d 767, 771 (11th Cir. 2005) (citations omitted). A factual determination is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Bailey v. Bailey (In re Bailey),* 254 B.R. 901, 903 (B.A.P. 6th Cir. 2000) (citations and internal quotations omitted).

### III.  FACTS

The facts of this case are complicated, highly suspicious, and largely undisputed. The Debtor and her ex-husband, Greg Forbes, were divorced in 1995. No spousal support was awarded under the parties' judgment of divorce, and Greg Forbes has never been under any legal obligation to support the Debtor. After their divorce, the Debtor and Greg Forbes remained co-owners of an airplane canopy manufacturer called Flight Materials, Inc. ("Flight Materials"). The Debtor served as President of the corporation. The record contains no written documentation of the Debtor's

ownership interest in Flight Materials nor of Greg Forbes' ownership interest for that matter. However, both the Debtor and Greg Forbes testified that the Debtor held a fifty percent ownership interest. In addition, Greg Forbes explained that, out of a sense of fairness, he always intended to give the Debtor half the proceeds from any sale of the business.[2]

In early 2003, Richard Malott ("Malott") and his company Ridgewood Associates, Inc. ("Ridgewood") expressed an interest in purchasing Flight Materials. Malott and Ridgewood made a $300,000 refundable deposit toward the purchase of the corporation. If Malott and Ridgewood elected not to purchase Flight Materials, the Debtor and Greg Forbes were to repay the $300,000 deposit within forty-five days. On January 15, 2003, the Debtor and Greg Forbes executed a $300,000 promissory note stating those repayment terms.

The record contains no documentary evidence of how the original $300,000 deposit was paid or disbursed. According to Malott's testimony at trial, he did not place the funds in an escrow account but instead issued a number of cashier's checks at the request of Greg Forbes and the Debtor. Although Malott did not remember the amounts of the cashier's checks or all of the recipients, he specifically recalled that one check was made out to Greg Forbes, one to the Debtor, and one to Gary Flanders, Greg Forbes' friend and business associate. Malott thought the check to Gary Flanders was in an amount between $50,000 and $100,000. (J.A. at 233.) Greg Forbes testified that he could not remember whether the check made out to Gary Flanders was for $85,000 or $100,000. (J.A. at 276.)

Malott and Ridgewood ultimately decided not to purchase Flight Materials. When asked why that decision was made, Malott testified that when the business records were reviewed, "[t]here were no financial statements. There were no W-2s. There were no 1099s. Things had been paid by cashiers check and cash. The whole operation was [run] in such a way that I did not want to deal with it." (J.A. at 198-99.) Malott subsequently demanded return of the $300,000 deposit. Neither the Debtor nor Greg Forbes repaid the deposit in full.

---

[2] It is unclear to the Panel why giving the Debtor half of any proceeds from the sale of the business would be done out of a sense of fairness since the testimony is uncontroverted that the Debtor owned fifty percent of Flight Materials.

On October 27, 2004, Malott and Ridgewood obtained a judgment against the Debtor, Greg Forbes, and Flight Materials in the amount of $354,298.79 in the Superior Court of California, Nevada County. It is not clear, however, that the judgment related solely to the failure to repay the $300,000 promissory note. The record reflects that Malott loaned Greg Forbes an additional $200,000 in April 2003, and that some portion of this loan remained unpaid at the time the state court judgment was entered. There is also evidence suggesting that some portion of the $300,000 obligation was repaid to Malott and Ridgewood prior to entry of the judgment.[3]

At the time Malott and Ridgewood were considering purchasing Flight Materials, the Debtor and her adult daughter, Francesca Forbes, lived in a single family residence located at 1116 Rivergate Road in Lodi, California (the "Lodi property"). The Debtor and Greg Forbes were leasing the Lodi property and had an option to purchase the property for $350,000 but had let that option expire. In February 2003, the owners of the Lodi property commenced eviction proceedings against the Debtor and Greg Forbes. The eviction proceeding was resolved pursuant to a settlement agreement, which included a $500,000 purchase option in favor of the Debtor and Greg Forbes.

In March 2003, the Debtor approached her sister, Eiseman, and informed her that the Debtor and Greg Forbes would not be able to obtain the financing that would be required to exercise their option to purchase the Lodi property. The Debtor then asked Eiseman if she would be willing to purchase the Lodi property, and Eiseman agreed to do so. The settlement agreement with the owners of the Lodi property was subsequently amended to extend the $500,000 purchase option to Eiseman.

Eiseman financed her purchase of the Lodi property by obtaining a $350,000 loan from World Savings Bank, FSB. Eiseman borrowed the balance of the purchase price and closing costs, in the total amount of $157,480.99, from Greg Forbes. At trial, Greg Forbes testified that he loaned this money to Eiseman at the request of the Debtor, because he wanted to provide a stable living environment for his daughter, Francesca. He further explained that he obtained the funds to loan to

---

[3] According to a complaint that was later filed by Malott and Ridgewood in the California state court, Ridgewood, Greg Forbes, and the Debtor executed a "memorandum to the written agreement [the promissory note]" on July 8, 2003. "The memorandum acknowledged that *on May 13, 2003, $50,000.00 was paid back on the $300,000.00 sum* and that on or about August 1, 2003, [Malott and Ridgewood] will receive an additional payment of $45,000.00 and will receive an additional $45,000.00 per canopy sold . . . ." (Trial Ex. 17; emphasis added.)

Eiseman by procuring an $85,000 loan from his longtime friend, Gary Flanders.[4] The remaining $75,000 came from the $200,000 loan Greg Forbes obtained from Malott in April 2003.[5] Eiseman testified that she never asked the Debtor or Greg Forbes about the source of the $150,000 loan. She stated that she received the asserted loan "interest free" and that there was no written documentation evidencing the loan.

There is no question that Eiseman purchased the Lodi property with the intention of allowing the Debtor and Francesca Forbes to reside there. Indeed, one day before the closing on the Lodi property, the Debtor, Greg Forbes, and Francesca Forbes entered into a residential lease agreement with Eiseman (the "Lodi lease"). Although Greg Forbes was not living at the Lodi property, he was included as a party to the Lodi lease because he was to be responsible for funding the monthly lease payments. These monthly payments were equal to the monthly principal and interest payment on the $350,000 bank loan. When the mortgage payments came due each month, Greg Forbes gave the Debtor the money to make the payments, and the Debtor deposited the funds into a bank account in Eiseman's name. Eiseman then made the mortgage payment. When tax and insurance payments came due on the Lodi property, the payments were handled in a similar manner.

The Debtor and her daughter lived at the Lodi property until November 2004. On December 1, 2004, Eiseman accepted an offer to purchase the Lodi property for $775,000. The sale closed on January 9, 2005, and Eiseman realized a gross profit of $275,000. Three days later, Eiseman repaid the original $150,000 loan from Greg Forbes by issuing him a check for the full amount.

Eiseman used the remainder of the profits from the sale of the Lodi property to purchase a new residence for the Debtor and her daughter in Kentucky located at 1151 Cummins Ferry Road in Versailles, Kentucky (the "Versailles property"), with the entire transaction handled by the Debtor as Eiseman's attorney-in-fact pursuant to a specific power of attorney executed on January 13, 2005.

---

[4] This tracks Malott's testimony that he, pursuant to Greg Forbes' instructions, gave Gary Flanders between $50,000 and $100,000 from the $300,000 deposit.

[5] Greg Forbes deposited a total of $160,000 into the escrow account used to fund Eiseman's purchase of the Lodi property, then received a portion of that money back, when the closing costs totaled only $7,480.99.

At the January 20, 2005 closing, the Debtor executed a promissory note and mortgage in favor of Countrywide Home Loans, Inc. ("Countrywide") in the original principal amount of $460,000. The monthly rent, mortgage, insurance and tax payments on the property were handled in a similar manner as had been used with the Lodi property, except that Francesca Forbes made the payments to Eiseman.

Around the time the Debtor and her daughter moved to the Versailles property, Greg Forbes gave them another cash gift – in the total amount of $157,000. At trial, Greg Forbes explained that he gave approximately $117,000 to his daughter, Francesca, to help her start her new dog grooming business. He gave the balance of the money to the Debtor to cover living expenses until the dog grooming business got off the ground.

On April 18, 2005, Malott and Ridgewood filed a First Amended Complaint for Fraudulent Transfer, Civil Conspiracy, and for Money Damages against the Debtor, Greg Forbes, Eiseman and Francesca Forbes in the Nevada County Superior Court of California. Among other claims, the complaint alleged causes of action for fraudulent conveyances and conspiracy relating to transfers of property from the Debtor and Greg Forbes to Eiseman and asserted that the defendants were attempting to evade paying their creditors, including Malott and Ridgewood. Eiseman filed a motion for summary judgment in the California action on February 24, 2006. Francesca Forbes also filed a motion for summary judgment.

On October 10, 2005, the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. James D. Lyon was appointed as chapter 7 trustee ("Trustee"). Shortly thereafter, on May 5, 2006, the Trustee filed this adversary proceeding against Eiseman, Greg Forbes, Ridgewood, Malott, and Countrywide. Count One of the Trustee's complaint alleged that the Debtor transferred funds to Eiseman for the purchase of the Lodi property and that the transfer was an actual or constructive fraudulent conveyance under California law. *See* Cal. Civ. Code § 3439 *et seq*. Count Two of the Trustee's complaint asserted that Eiseman's purchase of the Versailles property constituted a "perpetuation of the fraudulent transfer" by Greg Forbes, Eiseman and the Debtor. Accordingly, the Trustee's complaint sought to avoid the transfers under § 544(b) and to sell the Versailles property, free and clear of defendants' interests.

On July 11, 2006, nine months after the Debtor filed her bankruptcy petition, the California court issued a decision and order granting Eiseman's and Francesca Forbes' motions for summary judgment. In its opinion, the court held that Malott and Ridgewood "failed to present any evidence to establish fraud on the part of [d]efendant Eiseman regarding the loans she obtained from [c]o-defendant Gregory C. Forbes or any evidence that would raise even a triable issue of fact to that effect." (J.A. at 100.) The California court further held that Malott and Ridgewood "failed to present any evidence that there exists triable issues of fact regarding any liability owing from the [d]efendants to the [p]laintiffs pursuant to the UFTA [Uniform Fraudulent Transfer Act] or otherwise." (J.A. at 100-01.) According to the Trustee's appellate brief, Malott and Ridgewood appealed the California order on October 5, 2006.

On September 6, 2006, the adversary proceeding was tried before the bankruptcy court. At the conclusion of the trial, the bankruptcy court stated its findings of fact and conclusions of law in an oral bench opinion. The court began by noting the presence of several badges of fraud, including the fact that Eiseman was an insider of the Debtor, that the alleged transfer may have been concealed, and that the Debtor retained the Lodi and Versailles properties for her own use. The court identified the question of whether there had been a transfer of the Debtor's property as the "central issue" in the case. (J.A. at 306.) The bankruptcy court found that:

> [T]here was an unwritten agreement between the Forbes that [the Debtor] would receive half of the sale proceeds of the business Flight [Materials]. The Court does not believe it is simply coincidental that when a $300,000 down payment was made on the business, $150,000 plus ends up in the hands of Ms. Eiseman, who buys the house that [the Debtor] just happens to live in . . . .
>
> [T]he down payment for the house – the $150,000 plus 75 hundred in closing – while furnished by [Greg] Forbes was, in fact, intended to be [the Debtor's] half of the downstroke on the company in the amount of $300,000. [Greg] Forbes did not deny that half of the benefit of the company would belong to his wife per what he framed as his own generosity. The Court would believe that it was by agreement between [the Debtor] and [Greg] Forbes.
>
> The Court there[fore] concludes that the money for the down payment on the property was, in fact, [the Debtor's] money. It was [the Debtor's] money, and it was a transfer to her sister. It was, therefore, a fraudulent transfer . . . .

(J.A. at 306-07.) The court further reasoned that Eiseman used the down payment to purchase the Lodi property for the Debtor to live in and acted "as a conduit for sums to service the debts, pay the

-8-

taxes, pay the mortgage, and then roll the money over to another piece of property in her name in which [the Debtor] and Francesca would reside." (J.A. at 306.)  Having found that "at all times the property has been simply held on behalf of the [D]ebtor," and "following that transfer through [the Lodi property] and into the [Versailles] property," the court concluded that the Versailles property was property of the Debtor's estate and could be sold by the Trustee. (J.A. at 307.)

In accordance with its oral bench opinion, the bankruptcy court entered an Order of Judgment on September 11, 2006. The judgment states:

> (1) The transfer of $157,480.99 to [Eiseman] for the purchase of the [Lodi property] was property of Debtor, Cheryl Forbes, is a fraudulent transfer, and shall be avoided;
>
> (2) The transfer by [Eiseman] of the proceeds from the sale of [the Lodi property] which were used for the purchase of [the Versailles property] is fraudulent and shall be avoided;
>
> (3) The [Lodi property] and [Versailles property] were at all times held by [Eiseman] for Debtor Cheryl Forbes;
>
> (4) The [Versailles property] is property of the bankruptcy estate;
>
> . . . .
>
> (6) The [Versailles property] shall be sold by [the Trustee] free and clear of all liens, encumbrances, and mortgages with the liens, encumbrances, and mortgages attaching to the proceeds of the sale in the order of priority to which they are entitled[.]

(J.A. at 107-08.)  After the order was entered, Eiseman filed this timely appeal.

## IV.   DISCUSSION

The Trustee seeks to avoid the alleged transfers in this case by exercising his "strong arm" powers as set forth in § 544(b) of the Bankruptcy Code. Section 544(b) authorizes a trustee to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title . . . ." 11 U.S.C. § 544(b). Essentially, this provision permits the trustee to "stand in the shoes" of an unsecured creditor and assert causes of action under state fraudulent conveyance laws for the benefit of all creditors. *Am. Nat'l Bank of Austin v. MortgageAmerica*

*Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir. 1983); *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 100 (B.A.P. 6th Cir. 1997).

As this Panel has previously noted, "[t]he plain language of § 544(b) contains four requirements: (1) A creditor, (2) holding an allowable unsecured claim; and (3) a transfer of an interest of the debtor in property, (4) that is voidable under applicable [state] law." *In re Bushey*, 210 B.R. at 100. As the party seeking to avoid the transfer, the Trustee bears the burden of proving all elements of his fraudulent transfer claim by a preponderance of the evidence. *Hartvig v. Tri-City Baptist Temple of Milwaukie, Inc. (In re Gomes)*, 219 B.R. 286, 291 (Bankr. D. Or. 1998); *see Shapiro v. Matouk (In re Hayes)*, 322 B.R. 644, 646 (Bankr. E.D. Mich. 2005) (discussing the trustee's power to avoid fraudulent transfers under § 548).

A.   <u>Was the Loan from Greg Forbes to Eiseman a "Transfer of an Interest of the Debtor in Property?"</u>

The heart of the bankruptcy court's judgment was its finding that the initial $157,000 loan from Greg Forbes to Eiseman was, in effect, a transfer of the Debtor's property. As noted above, § 544(b) allows a trustee to avoid the transfer of "an interest of the debtor in property" to the extent the transfer constitutes a fraudulent conveyance under applicable state law. The Bankruptcy Code does not define the phrase "interest of the debtor in property." *In re Cannon*, 277 F.3d at 849 (discussing § 548(a)(1), which permits the trustee to avoid fraudulent transfers of "an interest of the debtor in property" made within one year before the filing of the debtor's bankruptcy petition). The United States Supreme Court has defined "an interest of the debtor in property" as including any "property that would have been part of the [debtor's bankruptcy] estate had it not been transferred before the commencement of the bankruptcy proceedings." *Begier v. IRS*, 496 U.S. 53, 58, 110 S. Ct. 2258, 2263 (1990) (interpreting "interest of the debtor in property" under § 547, which allows the trustee to avoid preferential transfers). The Supreme Court also looked to § 541(a)(1)'s definition of "property of the estate" for guidance in determining the scope of the debtor's interest in property for avoidance purposes. *Id.* at 58-59.

Section 541(a)(1) states that "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This definition is unquestionably broad, its main purpose being to "'bring anything of value that the

debtors have into the [bankruptcy] estate.'" *Booth v. Vaughan (In re Booth)*, 260 B.R. 281, 284-85 (B.A.P. 6th Cir. 2001) (quoting H.R. Rep. No. 95-595 at 176 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6136). "To this end the term 'property' has been construed most generously" and has been found to include a variety of tangible or intangible property as well as future, non-possessory, or contingent interests and causes of action. *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S. Ct. 511, 515 (1966); *see United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S. Ct. 2309 (1983).

Although the reference in § 544(b) to an "interest of the debtor in property" is federal law, a debtor's property interests are generally "created and defined by state law" unless a federal purpose requires otherwise. *Lehtonen v. Time Warner, Inc. (In re PurchasePro.com, Inc.)*, 332 B.R. 417, 423-24 (Bankr. D. Nev. 2005) (citing *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918 (1979)). Like the federal definition, the definition of "property" under California law is very broad: property is a "thing of which there may be ownership." Cal. Civ. Code § 654. Ownership, in turn, is "the right of one or more persons to possess and use [a thing] to the exclusion of others." *Id.*; *see Downing v. Mun. Court of San Francisco*, 88 Cal. App. 2d 345, 350 (1948) (the term "property" is "all-embracing so as to include every intangible benefit and prerogative susceptible of possession or disposition;" although the meaning of "property" may vary depending on the context in which it is used, it generally includes "any valuable right or interest protected by law") (citations and internal quotation marks omitted).

In this case, the Trustee seeks to avoid the initial down payment on the Lodi property under California fraudulent conveyance law. California law provides that a transfer of the debtor's property may be avoided to the extent it was made with the "actual intent to hinder, delay, or defraud" any creditor.[6] Cal Civ. Code § 3439.04(a)(1); *see Kendall v. Turner (In re Turner)*, 335

---

[6] California Civil Code § 3439.04(a) provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

    (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

    (2) Without receiving a reasonably equivalent value in exchange for the transfer

-11-

B.R. 140, 145 (Bankr. N.D. Cal. 2005) (describing California fraudulent conveyance law).  The requisite intent may be proven by consideration of the circumstances surrounding the transaction, commonly referred to as "badges of fraud."[7]  Cal. Civ. Code § 3439.04(b).  In addition, a transfer may be set aside as constructively fraudulent under California law if the debtor does not receive

---

or obligation, and the debtor either:

(A)  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B)  Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

[7] The "badges of fraud" are codified under California law and include:

(1)    Whether the transfer or obligation was to an insider.

(2)    Whether the debtor retained possession or control of the property transferred after the transfer.

(3)    Whether the transfer or obligation was disclosed or concealed;

(4)    Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5)    Whether the transfer was of substantially all the debtor's assets.

(6)    Whether the debtor absconded.

(7)    Whether the debtor removed or concealed assets.

(8)    Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9)    Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10)  Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11)  Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of a debtor.

Cal. Civ. Code § 3439.04(b).

reasonably equivalent value in exchange for the transfer and the transfer is made while the debtor is insolvent or renders the debtor insolvent.[8] Cal. Civ. Code § 3439.05.

There is no documentary evidence that the Debtor was legally entitled to one half of the $300,000 deposit. However, as the bankruptcy court noted, the Debtor and Greg Forbes both testified that the Debtor was half owner of Flight Materials and that they had an informal understanding that proceeds from any sale of the business would be divided equally between them. The testimony particularly from Greg Forbes, the co-owner of Flight Materials, confirming rather than contesting that the Debtor was half owner, is strong evidence establishing the Debtor's legal interest in Flight Materials and in half of the $300,000 deposit.

Moreover, this conclusion is supported by the fact that the Debtor signed the $300,000 promissory note pledging repayment of the deposit. The Appellants argue that there is no direct evidence linking the $157,000 loan to the Debtor's half of the $300,000 escrow deposit. Greg Forbes testified that he borrowed the funds he loaned to Eiseman from other sources – $85,000 from his friend, Gary Flanders, and $75,000 from Malott. Although Malott's testimony at trial disclosed that the Debtor received a cashier's check at the time the $300,000 deposit was made, there is no evidence of how much money the Debtor may have received at that time or how that initial distribution may have factored into the Debtor's "half of the downstroke."

Admittedly, this is a case based entirely upon circumstantial evidence. However, the circumstances surrounding the transactions involved are highly suspicious and strongly support the conclusion that the parties were engaged in an overall scheme to shelter assets from creditors. Several facts or coincidences, when analyzed together, support the bankruptcy court's determination that the $157,000 loan from Greg Forbes to his former sister-in-law, Eiseman, was property of the

---

[8] California Civil Code § 3439.05 states:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Debtor, and that the transfer of the funds to Eiseman constituted an avoidable fraudulent conveyance under § 544(b) of the Bankruptcy Code. For instance:

It is uncontradicted that Gary Flanders received a cashier's check from Malott in an amount between $50,000 and $100,000. Greg Forbes' testimony that it was either $85,000 or $100,000 is consistent with Malott's testimony. Malott, presumably, would have given Gary Flanders the check sometime after January 2003, because that was when Malott and Ridgewood were considering purchasing Flight Materials and the time period in which the Debtor and Greg Forbes executed the promissory note for the $300,000 refundable deposit. Thereafter, sometime before the closing of the Lodi property which occurred on May 9, 2003, Gary Flanders then "loaned" $85,000 back to Greg Forbes.

Eiseman did not pay any interest on the $157,000 loan received from her former brother-in-law. There was no written note or agreement with respect to the loan. When Eiseman paid Greg Forbes the full amount she owed him, Greg Forbes then turned around and gave the identical amount to his ex-wife and daughter.

Eiseman used the remaining $122,000 profit from the sale of the Lodi property for the benefit of the Debtor by using it to make a down payment on the Versailles property. Eiseman further obtained a $65,000 home equity line against the Versailles property for the purpose of supporting the Debtor.

The adult daughter that Greg Forbes testified "has major learning disabilities" (J.A. at 250.) and who would be so traumatized if required to move out of the Lodi property, was able to relocate to Kentucky by herself to attend school and open a dog grooming business. At the time of trial, Francesca Forbes was supporting her mother. (J.A. at 148-49.) Francesca Forbes "major learning disability" was dyslexia. (Appellant's Opening Statement, J.A. at 128.)

The bottom line is Eiseman has never been out any money from owning either the Lodi property or the Versailles property – not the down payments, not the mortgage payments, not the insurance and not the taxes. Eiseman claimed the rent paid on behalf of the Debtor as income and owes the IRS capital gains taxes on the $275,000 profit from the sale of the Lodi property. However, Eiseman testified that she intended to refinance the Versailles property to pay the capital gains tax

-14-

but those plans were hindered because of a lis pendens filed by Malott. Given the participants' history of convoluted verbal transactions, had Eiseman been able to complete those plans, it is reasonable to conclude that the new mortgage payment would be funded as the original Versailles mortgage. Again, Eiseman would not have incurred any expenses or paid any of her money in furtherance of the scheme.

Eiseman and the Debtor testified on many occasions that they did not discuss finances of the Debtor or Greg Forbes but then contradicted themselves. Eiseman knew the Debtor was not working. Eiseman was asked by the Debtor to buy the Lodi home. Eiseman knew that the Debtor either had to purchase the home or that she was going to be evicted. Eiseman asked how the Debtor was going to pay rent on the Lodi property. The Debtor advised Eiseman that Greg Forbes was going to pay the rent. Eiseman knew that Greg Forbes was going to borrow the down payment that he was going to give to her. She also knew that the Debtor and Greg Forbes had poor credit and believed they could not obtain a loan to purchase the Lodi property. Eiseman took out a $65,000 loan secured by the Versailles property to assist the Debtor and Greg Forbes because they were having financial problems, but Eiseman consistently testified she did not know anything about their finances. (J.A. at 172, 179-81, 186-87.) Most significantly, the parties stipulated prior to trial that: "In March 2003, the Debtor approached Ms. Eiseman and informed her that she and Greg Forbes were having some financial difficulties." (J.A. at 91.)

Neither Greg Forbes nor the Debtor have income of their own, although there is no evidence that either are unable to work. At the time of trial the Debtor's daughter was supporting her and Greg Forbes was living with another woman who was supporting him. In addition, the Debtor had the $65,000 loan from Eiseman and the $40,000 gift or loan from her ex-husband with which to support herself although there was no support obligation. (J.A. at 152-53.)

The bankruptcy judge is the one who has the opportunity to observe the witnesses' testimony and assess their credibility. Fed. R. Bankr. P. 8013. The bankruptcy judge's assessments of credibility are to be given particular deference. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985).

The clearly erroneous standard does not permit this Panel to substitute its assessments of credibility in place of the explicit findings made by the bankruptcy court. When differing views of

-15-

the evidence are possible, the bankruptcy court's findings cannot be clearly erroneous. *Anderson*, 470 U.S. at 574; *Duddy v. Kitchen & Bath Distribs., Inc. (In re H.J. Scheirich Co.)*, 982 F.2d 945, 949 (6th Cir. 1993); *Haskell v. Washington Twp.*, 864 F.2d 1266 (6th Cir. 1988). As long as the trial court's findings are "reasonable and supported by the evidence," they may not be overturned. *In re Southern Indus. Banking Corp.*, 809 F.2d 329, 331 (6th Cir. 1987).

The Debtor, Greg Forbes, Francesca Forbes and Eiseman were successful in leaving no paper trail as they proceeded with their scheme. We acknowledge that it is generally the Trustee's burden to trace the funds he claims are property of the estate. However, the fact that the parties did such a thorough job of playing a shell game with their money does not prevent the bankruptcy court and this Panel from examining all the circumstances surrounding the parties' evasive actions over several years to hinder the Debtor's (and Greg Forbes') creditors from being paid. As stated by the United States Court of Appeals for the Eleventh Circuit in *IBT International, Inc. v. Northern (In re International Administrative Services, Inc.)*, 408 F.3d 689, 708 (11th Cir. 2005), "proper tracing does not require dollar-for-dollar accounting." Like Greg Forbes, Francesca Forbes and Eiseman in the appeal before this Panel, the parties in *International Administrative Services* also engaged in multiple, complicated transactions to make it extremely difficult, if not impossible, to trace the funds in a scheme to defraud creditors.

When the record in this appeal is carefully reviewed, it is abundantly clear that the Debtor was determined to evade paying her creditors. Greg Forbes, Eiseman and Francesca Forbes were determined to assist the Debtor in that scheme. These parties, especially Eiseman, cannot ostrich-like stick their heads in the sand and pretend that the transfer of the Debtor's funds was a bona fide transaction, whether "loans" or otherwise. Eiseman cannot convincingly claim to have been a "well-intentioned, but gullible, part[y] who mistakenly fell victim" to this fraudulent scheme. *In re Int'l Admin. Servs., Inc.*, 408 F.3d at 706.

Notwithstanding the lack of documentation, the bankruptcy court's findings are not clearly erroneous. This Panel agrees with the bankruptcy court that the Trustee has successfully proved by a preponderance of the evidence that the $157,480.99 transferred by Greg Forbes to Eiseman to be used as a down payment on the Lodi property was originally the Debtor's portion of the $300,000 deposit received from Malott. *Cf. In re Int'l Admin. Servs., Inc.*, 408 F.3d at 708. Those funds are

traceable to the profits from the sale of the Lodi property and to the subsequent purchase of the Versailles property. We also agree with the bankruptcy court that the Versailles property constituted property of the Debtor's bankruptcy estate.

B.      Does the Trustee Have Standing?

We must next consider the argument raised by Eiseman that the Trustee does not have standing to pursue the fraudulent conveyance action because the Debtor does not have a creditor with an unsecured claim into whose shoes the Trustee may step to pursue the action.

"[T]o prevail under § 544(b), the trustee must first establish that at the time of the transaction there was, in fact, a creditor in existence who was holding an unsecured claim that is allowable under 11 U.S.C. § 502." *Parlon v. Claiborne (In re Kaylor Equip. & Rental, Inc.)*, 56 B.R. 58, 60 (Bankr. E.D. Tenn. 1985); *see In re Bushey*, 210 B.R. at 101; *Thomas v. Lawrence*, 302 B.R. 194, 196 (W.D. Ky. 2003). If such a creditor exists, "the first and second elements of § 544(b) are satisfied and the inquiry shifts: Would this creditor have standing under 'applicable law' to prosecute the avoidance action brought by the trustee?" *In re Bushey*, 210 B.R. at 101. "If the creditor is estopped or barred from recovery for some . . . reason, so is the trustee." *In re Marlar*, 252 B.R. 743, 754 (B.A.P. 8th Cir. 2000) (citing *Brent Explorations, Inc. v. Karst Enters., Inc. (In re Brent Explorations, Inc.)*, 31 B.R. 745, 748 (Bankr. D. Colo. 1983)), *aff'd*, 267 F.3d 749 (8th Cir. 2001); *In re Bushey*, 210 B.R. at 100 (the trustee is "subject to any defenses that could be asserted against the creditor").

In the present appeal, it is incontrovertible that the creditors identified in the Trustee's complaint, Malott and Ridgewood, were creditors of the Debtor at the time of the disputed transfer. There is no evidence that the state court judgment in the amount of $354,298.79 which Malott and Ridgewood obtained against the Debtor, Greg Forbes and Flight Materials in October 2004 was ever satisfied. Therefore, a creditor holding an allowable unsecured claim against the Debtor exists.

However, Eiseman asserts that Malott and Ridgewood were unable to prosecute their claim. Eiseman argues that Malott and Ridgewood already asserted their fraudulent transfer claims in the California state court action. Referring to the California court's summary judgment order, which states that Malott and Ridgewood "failed to present any evidence that there exists triable issues of fact regarding any liability owing from [Eiseman] to [Malott and Ridgewood] pursuant to the UFTA

or otherwise," Eiseman asserts that Malott and Ridgewood's fraudulent transfer claims have been adjudicated and rejected by the California court. Accordingly, she alleges that Malott and Ridgewood would be barred from asserting further fraudulent conveyance claims under California law, and the Trustee is barred from bringing a fraudulent conveyance action under § 544(b).

For two reasons, we determine de novo that the California court's order had no preclusive effect prohibiting the Trustee from prosecuting the bankruptcy court avoidance action. First, there is a question of whether the California court violated the automatic stay imposed by § 362 when it entered its order after the Debtor's bankruptcy petition. Second, there is a question of whether the California court order is final.

The Trustee correctly observes that both the Debtor's chapter 7 case and this avoidance action were filed prior to any judgment being rendered by the California state court. The record establishes that the Debtor filed her chapter 7 case nine months before the California court issued its order. Although the Trustee does not fully address the pertinent law, without question, the filing of the Debtor's bankruptcy petition generally stays individual creditors' "piece meal" actions to collect property that may have been fraudulently transferred by a debtor. *N.L.R.B. v. Martin Arsham Sewing Co.*, 873 F.2d 884, 887 (6th Cir. 1989). After the bankruptcy filing, the chapter 7 trustee has standing to avoid and recover such transferred property for the benefit of *all* creditors. *Id*. (citing *In re MortgageAmerica Corp.*, 714 F.2d at 1275). To the extent the California case involved alleged fraudulent transfers of the Debtor's property and proceeded after her bankruptcy filing, the postpetition entry of the summary judgment order violated the automatic stay and is invalid. *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993) (holding that "actions taken in violation of the stay are invalid and voidable and shall be voided absent limited equitable circumstances"). Accordingly, the summary judgment order will not be given preclusive effect. *See Soares v. Brockton Credit Union (In re Soares)*, 107 F.3d 969, 975 (1st Cir. 1997) (judgment was not ministerial and was entered postpetition in violation of automatic stay); *Constitution Bank v. Tubbs*, 68 F.3d 685, 693 (3d Cir. 1995) (district court judgment entered postpetition was in violation of automatic stay and was invalid); *Fleet Consumer Discount v. Graves (In re Graves)*, 33 F.3d 242, 247 (3d Cir. 1994) (bankruptcy court was correct in not giving preclusive effect to state court orders entered postpetition in violation of the automatic stay).

Further, in his brief the Trustee notes that Malott and Ridgewood appealed the California summary judgment order on October 5, 2006, and states that the appeal is still pending in the California state courts. Therefore, the Trustee argues that there has been no final resolution of Malott and Ridgewood's fraudulent conveyance claim.

Although Eiseman does not contest that the appeal has been filed and is pending in California, she objects to the Trustee's reference to the appeal, because the appeal was not part of the record before the bankruptcy court. Eiseman raised the preclusion issue as a defense to the Trustee's fraudulent conveyance assertion. Therefore, Eiseman has the burden of proof on that issue. *See Browning v. Levy*, 283 F.3d 761, 771-72 (6th Cir. 2002). Because of the requirements of California law discussed below, without explicit information as to whether the order had been appealed, a court is unable to determine the finality of the California order. It is Eiseman's burden to provide proof that the California order has not been appealed. She failed to do so in the bankruptcy court per the record before this Panel.[9] Eiseman's objection to the Trustee providing information about the appeal is not persuasive.

In the context of preclusion principles, federal and state court judgments are typically considered final, even when the judgment is on appeal. *Wright v. Turner (In re Turner)*, 204 B.R. 988, 992 (B.A.P. 9th Cir. 1997) (citing *Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir. 1988); *Sandoval v. Superior Court*, 140 Cal. App.3d 932, 937 n.2 (1983)). "California, however, does not follow the majority rule." *Id.* (citing *Sandoval*, 140 Cal. App.3d at 936-37). California Code of Civil Procedure § 1049 provides: "[a]n action is deemed to be pending from the time of its commencement until its final determination upon appeal, or until the time for appeal has passed, unless the judgment is sooner satisfied." Cal. Civ. Proc. Code § 1049. If an appeal was lodged, Malott and Ridgewood's fraudulent conveyance action is still "pending" under California law. Because Eiseman did not establish lack of an appeal under California law to establish her defense that the California order has preclusive effect, there was no preclusion which prohibited the bankruptcy court from entering its judgment.

---

[9] Eiseman could easily have provided the bankruptcy court with a copy of the California docket showing no appeal had been lodged, if this were indeed correct.

-19-

## V.  CONCLUSION

Based on the record on appeal, with deference to the bankruptcy court's factual findings, and this Panel's de novo review of the law, the decision of the bankruptcy court is AFFIRMED.